IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| VIRGINIA L. JOHNSON | ) | |
| | ) | Case No: 4:07-CV-28 |
| v. | ) | MATTICE/CARTER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
|    Commissioner of Social Security | ) | |

<u>REPORT AND RECOMMENDATION</u>

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of plaintiff's Motion for Judgment on the Pleadings (Doc. 16) and defendant's Motion for Summary Judgment (Doc. 17).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be AFFIRMED.

<u>Plaintiff's Age, Education, and Past Work Experience</u>

Plaintiff was 41 years old on the date she was last insured for Disability Insurance Benefits (DIB) (Tr. 17). She had a limited education and past relevant work experience as a cashier (light, semi-skilled) and office worker (light, semi-skilled) (Tr. 17).

1

Administrative Proceedings

This is an action for judicial review of Defendant's final decision denying Plaintiff's application for DIB. 42 U.S.C. § 423. On November 14, 2003, Plaintiff protectively filed for DIB, alleging a disability onset date of June 1, 1992, due to her back and heart conditions (Tr. 11, 13, 69-71). The date she was last insured for DIB was September 30, 1996 (Tr. 11). After holding an administrative hearing on August 18, 2006, Administrative Law Judge (ALJ) John F. Proctor issued a decision finding that Plaintiff was not disabled because she retained the capacity to perform a significant number of sedentary jobs in the national economy (Tr. 18). On March 22, 2007, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (Tr. 4-6). *See* 20 C.F.R. § 404.981.

Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has

done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the Plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.,* 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 1996.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 1992 through her date last insured of September 30, 1996 (20 CFR 404.1520(d) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease and coronary artery disease (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a full range of sedentary work activity.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on August 31, 1995 and was 41 years old on the date last insured, which is defined as a younger individual age 18-44 (20 CRF § 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR § 404.1564).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR § 404.1560(c) and 404.1566).

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time from June 1, 1992, the alleged onset date, through September 30,

1996, the date last insured (20 CFR § 404.1520(g)).

(Tr. 13-18).

## Issues Raised

Plaintiff raises the following issues:

1. Whether the ALJ erred in failing to give her treating physician's opinion controlling weight and whether the ALJ properly considered all of Plaintiff's symptoms including pain and discomfort.

2. Whether substantial evidence supports the ALJ's finding that Plaintiff retained the capacity to perform sedentary level work from her alleged disability onset date of June 1, 1992 through her date last insured of September 30, 1996.

## Relevant Facts

### Medical Evidence

Back Condition:

In March 1992, Plaintiff started seeing Timothy Schoettle, M.D. regarding complaints of chronic back pain with intermittent pain into her right leg (Tr. 240). Dr. Schoettle noted diffuse tenderness to palpation through the low back and into the bilateral sacroiliac joints. Straight leg raising test bilaterally increased her pain, causing a burning sensation in the legs, but was not a classic radicular pain. Motor and deep tendon reflex examination was normal. She did have diminished sensation in an S1 dermatome bilaterally, primarily in the upper portion of the S1 dermatome. Vascular examination was within normal limits. His impression was chronic back pain, probably secondary to diffuse lumbar disc disease and spondylosis. Dr. Schoettle ordered a lumbar MRI (Tr. 240). Plaintiff underwent a lumbar MRI, which showed a mild left lateral disc bulge at L4-5 and a mild right lateral degenerative disc bulge at L5-S1 which caused moderate

5

inferior neural foraminal narrowing (Tr. 268). Plaintiff followed up with Dr. Schoettle in May 1992 where he noted that Plaintiff continued to be quite disabled with back pain and bilateral leg pain (Tr. 240). Dr. Schoettle recommended further diagnostic testing (Tr. 240).

In June 1992, Plaintiff had a lumbar spine CT scan which showed a broad-based disc bulge with focal protrusion at L4-5 on the right (Tr. 265). Therefore, in June 1992 Plaintiff was diagnosed with lumbar stenosis. She underwent a lumbar myelogram and post-myelogram CT, which revealed "mild to moderate central disk bulge at L5-S1 and a broad-based disk bulge with focal protrusion at L4-5 on the right" (Tr. 168). She was found to have some spinal stenosis at L4-5 (Tr. 168).

In August 1992, Dr. Schoettle performed a decompressive lumbar laminectomy at L4-5 with disc excision at L4-5 on the right (Tr. 159). Dr. Schoettle performed the surgery due to Plaintiff's lumbar stenosis and herniated disk at L4-5 on the right (Tr. 159). Later in August 1992, Plaintiff underwent a post-operative lumbar MRI which showed no evidence of a recurrent herniated lumbar disk, epidural abscess, or other fluid collection. Mild disc bulge was present and there was mild left and moderate right foraminal narrowing (Tr. 264). In October 1992, Plaintiff underwent an electromyogram (EMG) of her right lower extremity and related paraspinal muscles; it revealed normal results. There was narrowing of the L4-5 and L5-S1 discs and minimal degenerative change (Tr. 270-71). That same day she also underwent a lumbar myelogram and post-myelogram CT which showed very mild ventral effacement at L4-5 and L5-S1, but no evidence of recurrent disc herniation, and a mild disk bulge at L3-4 (Tr. 165, 263). She was diagnosed with lumbar spondylosis (Tr. 165).

After undergoing the diagnostic studies in October 1992, Plaintiff saw Dr. Schoettle for a

follow up (Tr. 166). Dr. Schoettle indicated that Plaintiff's myelogram results were "essentially normal" for her post-operative state and showed resolution of nerve compression (Tr. 166). Dr. Schoettle also commented that Plaintiff's EMG studies were normal (Tr. 166). However, since Plaintiff still complained of pain, he recommended that she undergo a series of epidural steroid blocks, thinking that Plaintiff may have an inflamed nerve root which was continuing to be painful despite decompression (Tr. 166). He also recommended continued use of Vicodin for pain (Tr. 166). Dr. Schoettle administered the lumbar epidural, but in November 1992, Plaintiff reported that the epidural provided no relief to her and she did not want to pursue further blocks (Tr. 166). However, after Dr. Schoettle explained that this was her best treatment option, Plaintiff agreed to complete her treatment (Tr. 166).

In December 1992, Dr. Schoettle noted Plaintiff's reports that although she continues to have a lot of significant radicular pain, her back condition had improved after five epidural blocks (Tr. 238). Dr. Schoettle recommended that Plaintiff also become more active with walking (Tr. 238).

In February 1993, Plaintiff saw Dr. Schoettle for a follow up and reported that she had excruciating back pain, but upon examination, Dr. Schoettle found Plaintiff to have negative straight leg raising (Tr. 238). Also, he noted that her post-op diagnostic studies (myelogram and EMG) were normal with her MRI only showing post-operative scar changes (Tr. 238). Plaintiff and her husband requested a second opinion and Dr. Schoettle agreed to set that up (Tr. 238). In the meantime, Dr. Schoettle recommended continued steroid blocks, and exercise on a treadmill (Tr. 238). Dr. Schoettle noted that while Plaintiff's complaints seem to suggest arachnoiditis, the diagnostic studies showed no evidence of it (Tr. 238). Dr. Schoettle stressed to Plaintiff that she

7

needed to taper off her narcotic usage (Tr. 238).

In April 1993, Plaintiff saw Dr. Schoettle and reported that she made some "slight progress" over the past two months (Tr. 238). Dr. Schoettle noted that Plaintiff was ambulating better and had negative straight leg raising to 90 degrees (Tr. 238). Dr. Schoettle indicated that Plaintiff was "getting by fairly well" with her present medication regimen (Tr. 259). Plaintiff reported that she decided to defer on having the second opinion and the blocks (Tr. 238). She reported not taking any Dilantin (Tr. 238). In June 1993, Dr. Schoettle noted that Plaintiff's physical exam was unchanged, but that she was requiring more medication to function. She was not resting very well at night. (Tr. 258).

In July 1993, Plaintiff returned to Dr. Schoettle reporting a dramatic increase in leg pain (Tr. 255). Dr. Schoettle asked Plaintiff to see Dr. Robert Cochran for a neurologic pain consultation (Tr. 255).

Eight months after last seeing Dr. Schoettle, in March 1994, Plaintiff returned for a follow up visit. She reported that her back pain and leg pain were unrelenting during the seven months from July 1993 until March 1994 (Tr. 254). Plaintiff reported that in the last eight months, her condition had been maintained by Dr. Fredi who placed her on a regimen of four Vicodin per day and that she also saw a local chiropractor where she had beneficial treatment (Tr. 254). Dr. Schoettle expressed some concern with Plaintiff's narcotic usage stating he was "hesitant to commit to that type of dose of narcotics on a long-term basis" (Tr. 254). He again recommended a consult with Dr. Cochran (Tr. 254).

Nine months later, in December 1994, Plaintiff returned to see Dr. Schoettle. Dr. Schoettle noted that Plaintiff "was getting by on two Vicodin ES per day." Dr. Schoettle advised

Plaintiff to return for follow-up in six months (Tr. 253).

In June 1995, Plaintiff reported to Dr. Schoettle that she had been relatively stable, but that she had some increased pain as she had been working and more active over the summer. She indicated that her pain was not being controlled with two Vicodin per day. Dr. Schoettle noted that Plaintiff's exam remained stable, but added four Ultram per day to Plaintiff's regimen (Tr. 252).

In December 1995, Dr. Schoettle noted that Plaintiff's condition remain unchanged, continuing to have chronic back pain and radicular leg pain. He noted the narcotic usage contract Plaintiff had with him and with Dr. Cochran wherein she agreed to only obtain narcotics from them. Dr. Schoettle noted that with the narcotics, for the last several years, Plaintiff had been able to "function [sic] on quite well." Dr. Schoettle noted that Plaintiff's objective examination remained unchanged; she continued to have positive straight leg raising. A follow-up was schduled in six months (Tr. 251).

In June 1996, Dr. Schoettle noted that Plaintiff had been at a relatively stable plateau on her medication regimen and that he planned to continue her on the present regimen for the next six months. Her objective examination remained stable (Tr. 250). Dr. Schoettle made similar findings six months later, in December 1996. She continued to have a substantial amount of radiculitis type pain (Tr. 249). In June 1997, Dr. Schoettle noted that on her present regimen (with Prozac), Plaintiff was getting "good control" of her chronic radiculitis (Tr. 248). In December 1997, Plaintiff continued to ask for higher doses of narcotics, which Dr. Schoettle refused in light of her stable objective examination findings. However, he assessed her as having a chronic pain syndrome (Tr. 247). In January and July 1999, Dr. Schoettle noted that Plaintiff

9

was running a flea market on weekends where she worked lengthy hours and stood on concrete (Tr. 244-45).

Notes from a nurse practioner in Dr. Schoettle's office on April 4, 2000 indicate Plaintiff continued to complain of back pain with bilateral leg pain to the knee, left worse than the right. No numbnesss or tingling or bowel or bladder dysfunction was reported. Examination revealed full range of motion in her back. Plaintiff had pain with extension of her lower extremity. Muscle strength was equal bilaterally and she had negative straight leg raise (Tr. 242). On an October 3, 2000 office visit, the nurse practitioner reported complaints of increased pain in Plaintiff's back over the past month. Plaintiff reported increased muscle spasm in her back and pain while walking. Plaintiff reported no numbness or tingling, no bowel or bladder dysfunction. Again, examination revealed normal neurological exam and negative straight leg raise. Plaintiff had palpable muscle spasm on her lumbar spine and diminished range of motion in her back (Tr. 241).

In April 2004, a state agency reviewing physician reviewed the record and opined that through her date last insured in September 1996, Plaintiff could have performed light level work (*i.e.*, occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, and stand, sit, and walk about six hours in an eight hour workday) (Tr. 380-81, 386).

Cardiac Condition:

In October 1993, Plaintiff underwent a cardiac catherization at a local hospital due to chest pain (Tr. 172). The test results showed a very severe (95-99%) mid left anterior descending artery (LAD) stenosis (Tr. 172). Due to Plaintiff's continued complaints of chest pain, Joseph Fredi, M.D. performed a Percutanueous Transluminal Coronary Angioplasty (PTCA) and also

placed a stent (Tr. 172). Since Plaintiff developed a right groin hematoma three days after surgery, R. Bonau, M.D., performed a right femoral artery exploration to repair common femoral artery with saphenous vein patch angioplasty (Tr. 185).

In December 1993, due to Plaintiff's continued complaints of angina at rest, Todd Shuman, M.D. performed a coronary artery bypass grafting (times one) (Tr. 189-92). In January 1994, Plaintiff went to the St. Thomas Hospital with complaints of post-operative severe and persistent chest pain (Tr. 205). Chest x-rays revealed persistent left pleural effusion, but were otherwise unremarkable (Tr. 205). Plaintiff was advised to see her family physician as needed and to also see Dr. Shuman, her original surgeon (Tr. 206).

By February 1994, Plaintiff saw Dr. Shuman for a follow up visit and noted that Plaintiff had no more complaints of angina, shortness of breath, or dyspnea on exertion (Tr. 217). She reported that her costrochondral pain had gotten better; Dr. Shuman advised Plaintiff to take a 10-day course of Ibuprofen as well as a small dose of double strength Vicodin (Tr. 218). Her only other medications were aspirin and Lopresor (Tr. 217). Dr. Shuman noted that Plaintiff's cardiac examination revealed a regular rate and rhythm without murmur. Chest x-rays showed clear lung fields with resolving left basilar atelectasis and no significant pleural effusion (Tr. 217). The record shows no more evidence of cardiac treatment through Plaintiff's date last insured in September 1996.

<u>Medical Evidence submitted after the Administrative Hearing:</u>

Plaintiff attached a May 17, 2007 letter from her treating physician, Dr. Schoettle. This evidence was not and could not have been considered by the ALJ and offers an opinion relating to Plaintiff's condition from 1992 until 2007. Since Plaintiff's date of last insured was

11

September 30, 2006, the opinion is one that relates to a time period from approximately 15 years in the past through the date of last insured, which was more than ten years prior to the date of the opinion letter. Dr. Schoettle opines as follows:

> It is my opinion, within reasonable medical certainty, that she has been fully disabled from the job market since 1992 and that she has had maximal treatment of her low back situation to present; treatment is symptomatic treating her with Vicodin and Soma and Ambien. She has not been able to work medically since 1992 and has additional comorbidities of two aneurysm clippings with intermittent seizure activities, hypertension, and is status post coronary artery bypass. Due to her need for chronic narcotics and the anticipated long term need for this, I do not think she is suitable for even a sedentary job due to limited capabilities of driving and sedation from these medications that would limit her capabilities to perform desk work or sedentary work. It is my opinion that this condition has existed consistently since 1992 and I do not anticipate it to change in the future.

(Doc 12, Exhibit B).

## Analysis

Plaintiff argues that the ALJ erred by not giving great weight to Dr. Schoettle's comment in May 1992 that Plaintiff continued to be "quite disabled with back pain and bilateral leg pain." *See* Plaintiff's Brief at 5 *citing* Tr. 240. In response, the Commissioner notes Dr. Schoettle made this statement three months *before* he performed a decompressive lumbar laminectomy on Plaintiff. After he performed the August 1992 surgery, Dr. Schoettle found that Plaintiff had functioned "quite well" on her medication regimen with her chronic radiculitis (Tr. 159, 251). As the ALJ and Dr. Schoettle noted, while Plaintiff continued to report back and leg pain *post-operatively*, her diagnostic studies (CT scan and myelogram) were normal and her post-operative lumbar MRI study showed only post-operative scar changes (Tr. 14, 166, 238). In a February 8, 1993 treatment note, Dr. Schoettle notes plaintiff's clinical picture is beginning to sound a lot

12

like an arachnoiditis, but there was no evidence seen on MRI scan or myelography of any arachnoiditis (Tr. 238). Moreover, as the ALJ and Dr. Schoettle also noted, her *post*-operative clinical examination findings were stable, without any marked abnormalities, well beyond her date last insured of September 1996 (Tr. 14, 238, 247-52, 258). Further undermining Plaintiff's claims of having disabling symptoms, the Commissioner argues Plaintiff had significant gaps in treatment with Dr. Schoettle. The actual gaps in treatment were in the 8 to 9 month range (Tr. 253-55). Moreover, continues the Commissioner's argument, the record seems to suggest that a potential reason for Plaintiff's continued complaints may have been narcotic drug seeking behavior. The undersigned notes there does appear to have been some concern by her treating physician related to the possibility of excessive use of narcotics (Tr. 247, 254), however, it is clear that the physicians were prescribing narcotics to address Plaintiff's discomfort.

In any event, I agree with the Commissioner that Plaintiff's suggestion that her condition could possibly be so severe as to meet the criteria of Listing 1.04[1] is not at all borne out by the record. *See* Plaintiff's Brief at 6. Plaintiff cites to *pre*-operative findings which only lasted approximately five months, ignoring her largely normal *post*-operative findings cited above. Id. See 20 C.F.R. § 404.1505 (in order to prove disability, a claimant must prove he or she had disabling limitation(s) for at least a <u>continuous</u> 12 months) (emphasis added).[2] There is no

---

[1] *1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).* 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 1.04.

[2] *Similarly, Plaintiff only treated for her cardiac condition beginning in October 1993; by February 1994, Plaintiff was no longer complaining of angina, shortness of breath, or dyspnea (Tr. 172, 217). Further undermining Plaintiff's claims of any disabling limitations on account of her cardiac condition is the fact that the record*

13

medical opinion of record that states the listings are met.

Looking at all of the medical evidence as it exists in 2007, there is strong evidence to suggest Plaintiff is disabled and would not be able to perform meaningful work at any level. However, the question is, was there substantial evidence in the record to support the conclusion of the ALJ about Plaintiff's condition and ability to work as of the date she was last insured, September 30, 1996. Plaintiff has submitted a letter dated May 17, 2007 from Dr. Schoettle (which is attached to her complaint); this letter does refer to her condition since 1992 and up until her date last insured of September 1996. At most this additional evidence submitted after the ALJ's decision can only be considered by a reviewing court to determine if remand for consideration of additional evidence is warranted. *See* 42 U.S.C. § 405(g); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). The Commissioner argues Plaintiff has not made any attempt to request nor to show that remand is warranted and therefore argues Plaintiff has waived any such consideration of the issue.

In any event, even if Plaintiff has not waived the issue, the evidence cannot be considered unless the additional evidence is found to be material and it can be so found only if there is a reasonable probability that the ALJ would have reached a different conclusion regarding the disability claim if presented with the additional evidence. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). I conclude that Dr. Schoettle's May 2007 opinion (that Plaintiff was unable to work since 1992) would not have changed the ALJ's ultimate determination as it was not given contemporaneously; rather, his opinion was rendered 11 years

---

*documents no more treatment for her cardiac complaints after February 1994 through her date last insured of September 1996.*

after the relevant time. Moreover, Dr. Schoettle indicated that Plaintiff could not even perform a sedentary job due to her narcotic usage and resultant limited driving capabilities and sedation from these medications. However, contrary to Dr. Schoettle's reasoning, his office notes never indicated that Plaintiff experienced sedation or driving limitations as a result of her narcotic usage prior to her date last insured (Tr. 166, 238, 249-55, 258-59). Moreover, shortly after Plaintiff's date last insured, Dr. Schoettle noted that Plaintiff was running a flea market on weekends where she worked lengthy hours and stood on concrete–which is, as the Commissioner argues, well in excess of the demands of sedentary work (Tr. 244-45). Further, Plaintiff reported to Dr. Pinga in a March 6, 2004 examination that she last worked as a bookkeeper in November of 2003 (Tr. 290). This record evidence contradicts Dr. Schoettle's May 2007 opinion. Considering that, coupled with the fact that the opinion is rendered 11 years after Plaintiff's date last insured, I conclude the opinion would not have changed the ALJ's determination. I further conclude that the ALJ was not required to give the treating physician's opinion of May 17, 2007 controlling weight in light of the limited objective findings prior to the date of last insured after surgery, the evidence of Plaintiff's activities prior to the date of last insured, and the length of time from the date of last insured to the date of the treating physician's opinion.

In sum, in light of the above-noted evidence, the ALJ reasonably determined that Plaintiff could perform sedentary work through her date last insured (Tr. 15). And, while the state agency reviewing physician found that Plaintiff could perform light level work through her date last insured, the ALJ gave Plaintiff every benefit when he limited her to sedentary work only. The record prior to September 30, 1996, the date of last insured, has no specific opinions of the residual functional capacity of Plaintiff to contradict the State Agency opinion on which the ALJ

15

relied. Plaintiff has not shown otherwise. *See* 20 C.F.R. §§ 404.1512; 416.912 (burden of proof is on claimant).

There is no doubt the Plaintiff continued to experience pain after her first surgery and prior to the date of last insured and the record shows her physicians were treating that pain with a number of medications. However, the residual functional capacity assessment was performed after a review of the medical record and the State Agency Physician concluded Plaintiff could perform light work.

A claimant's statement that he/she is experiencing disabling pain or other symptoms will not, taken alone, establish he/she is disabled. 20 C.F.R. §§ 404.1529(a) and 416.929(a). One must first use a two-pronged analysis requiring some degree of objective medical evidence to evaluate a claimant's assertions of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain.

*Felisky v. Bowen*, 35 F. 3d 1027, 1038-39 (6th Cir. 1994) (quoting *Duncan v. Secretary of Health and Human Servs.*, 801 F. 2d 847, 853 (6th Cir. 1986)); *see also*, 20 C.F.R. §§ 404.1529 (a) and 416.929 (a).

Because pain is primarily a subjective sensation, claimants rarely establish the second prong of the two pronged test by producing objective medical evidence confirming the severity of the alleged pain. Rather, claimants most often meet the second prong by showing that the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. Unlike the first option, this second option does not require

objective evidence of the pain itself. *Duncan*, 801 F.2d at 853. However, once a claimant has produced objective medical evidence that his/her impairment could reasonably be expected to produce the pain alleged, the inquiry does not stop there. The Commissioner must then consider other evidence to evaluate the actual severity of the claimant's pain:

> The finding that your impairment(s) could reasonably be expected to produce your pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of your symptoms.

20 C.F.R. §§ 404.1529(b) and 416.929(b).

> When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.

20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1). Other evidence aside from medical signs and laboratory findings include the claimant's medical history, statements by treating physicians, medications taken, medical treatment other than medication received to relieve pain or other symptoms, methods the claimant has used to relieve pain, precipitating and aggravating factors, daily activities, and statements by the claimant. 20 C.F.R. §§ 404.1529(c) and 416.929(c). The ALJ shall also consider the credibility of the plaintiff's statements about his/her pain. *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 538 (6th Cir. 1981); *see also* 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). In so doing, the ALJ shall consider, among other things, whether there are any inconsistencies between the claimant's statements and the rest of the evidence including but not limited to medical signs and laboratory findings, physicians' statements, and the claimant's activities. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of observing the demeanor and credibility of

the witness, his conclusions should be highly regarded. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *Villarreal v. Secretary of Health and Human Services*, 818 F.2d 461, 463 (6th Cir. 1987).

In this case the ALJ addressed Plaintiff's pain as follows:

The record shows some residual back pain from the claimant's surgery in 1992; however, her condition remained relatively stable until after her date last insured. Repeat CT scans in 1992, following her surgery, demonstrated only very mild ventral effacement with no evidence of recurrent herniation or a surgical lesion (Exhibit 2F). EMG was also normal and failed to demonstrated [sic] chronic radicular abnormalities (Exhibit 2F). Although she consistently sought treatment for allegations of persistent pain, the claimant's treating specialist reported her condition as stable. Her medications required episodic adjustments but she did not report significant adverse side effects which would have impacted her overall functioning. The claimant's back condition remained stable until several years after her date last insured when she underwent surgical fusion. However, prior to her date last insured, the objective and clinical findings did not show abnormalities to warrant any further surgery.

. . .

The claimant's allegations of constant pain and severe functional restriction of disabling severity, as well as residual shortness of breath with any activity, are not corroborated by the clinical and objective findings. Her back condition remained stable following her laminectomy in August 1992 until several years after her date last insured. The claimant's cardiac condition developed in October 1993 and, following bypass in December 1993 and an appropriate recuperative period, she has since done well. In fact, she denied experiencing any residual angina pain, shortness of breath, or dyspnea to her treating specialist in February 1994, which is inconsistent with her testimony of persistent shortness of breath with any activity (Exhibit 6F). Accordingly, I do not find the claimant's testimony and allegations of record, as it pertains to her symptoms and functional limitation through September 30, 1996, to be fully credible or supported by the overall record.

(Tr. 16).

I conclude that the ALJ adequately assessed Plaintiff's complaints of pain and there is substantial evidence to support his conclusions as to Plaintiff's credibility.

In light of the record as a whole, I conclude there was sufficient evidence to support the conclusion of the ALJ that as of her date of last insured, Plaintiff was able to perform a full range of sedentary work and was therefore not disabled because she was able to perform work that exists in significant numbers in the national economy.

<u>Conclusion</u>

For the reasons stated herein, since there is substantial evidence to support the conclusion of the ALJ, I RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 17) be GRANTED, the Plaintiff's Motion for Judgment on the Pleadings (Doc. 16) be DENIED, and this case be DISMISSED.[3]

Dated: April 8, 2008
s/*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[3]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).